and James T. Perrin, et al., defendants' appellees. Arguing on behalf of the plaintiff's defendant, determinant Ms. Andrea R. Filets. Arguing on behalf of the defendant's attorney, determinant Ms. Audrey A. Berry. Thank you. Is it Filets or Filets? Filets. Thank you. You may proceed. Usually names don't use long vowels. They usually use short vowels. It's Hungarian, so it's Filets. Thank you. You may proceed. Thank you. Good afternoon, Justices. May it please the Court, Counsel. I'm here today seeking justice that Mary Lacey was denied even before this lawsuit was filed. When the North Chicago Police Department engaged in fraud by making adulterated copies of the original radio calls to cut out portions unfavorable to their defense. Did the trial court make any findings consistent with that argument? Yes, it did. Specifically, who was it? Specifically, the trial court found, after listening to the tapes, that they had been altered, they were not complete, they left out portions, and as a result, the trial court barred their use during the trial. In your favor? In my favor. However, since the trial court refused to permit me to add a spoliation of evidence count to amend the complaint to have that, I was not able to bring before the jury the fact that the tapes had been destroyed, and I was also given a choice from the trial court between either not using the tapes or getting a 501 instruction. And in my opinion, I should have been allowed both, to be able to bar the tapes and to get a 501 instruction that there should be a negative inference as a result of the non-production of the tapes. In addition, despite being timely asked to preserve the originals, the North Chicago Police Department destroyed them without giving the plaintiff an opportunity to hear them while observing the timestamps. During the course of the lawsuit, defendants counsel misled us to believe that the original tapes were still in existence, that we were provided with complete and accurate copies, and to believe that the originals, had they existed, would have contained no timestamps. During the motion stage, the court was misled to believe there was execution and enforcement of the law by the defense counsel conflating the terms stolen vehicle with a vehicle taken without permission, and misled the court to think that the vehicle taken without permission was fleeing and eluding Officer Brayer in their summary judgment motion. The entry of the summary judgment order unfairly precluded the jury from considering whether Officer Perrin's conduct was willful and wanton. Margo Willis' testimony was that he was so distracted before he entered the intersection that he never bothered once to look up from whatever it was he was looking at inside his squad car. Of course, he says the opposite. Your position probably is going to be, it still creates a genuine issue of material fact for the jury. Is that your position? Yes, yes, that there was a genuine issue of material fact whether his conduct was willful and wanton. That should have been properly left to the jury, but the partial summary judgment motion took that away from the jury's consideration. And in the cases where the court has found that an officer's conduct was not willful and wanton as a matter of law, in every case there was no evidence that the officer who was in pursuit was driving recklessly. That would include the cases cited by defense counsel with Brock, Hall, Laco, Morton, Urban, Shuttlesworth, and Wade. And in none of those cases was there any conduct alleged that it all was like the conduct that occurred in this case. On the other hand, the willful and wanton cases that have been decided where there's a question of fact that the jury should be left to decide include Hudson, which I believe is the case most factually similar to the case at Barr. Because in that case, the officer claimed to be assisting another officer who was in the Hudson case actually in pursuit of a stolen vehicle. And the court found that it was a jury question whether the officer's conduct was willful and wanton, and also found that it was proper for the court to consider whether the officer had complied with the department's rules and regulations. Wasn't that case involved with a long-time high-speed chase? I believe that was the case where the officer was driving on the expressway. It wasn't a long chase, but she cut over four lanes of traffic and hit the plaintiff's car, which it pulled over partially but not entirely. Okay, I remember the case. And in that case, the court found that that case, along with the Solansky case, found that facts supporting whether the officer was engaged in willful and wanton conduct include the fact that the nature of the area was suburban, as was the case here, and that the driver was suspected of a nonviolent property-based felony. Well, in this instance, the driver wasn't even suspected of any felony. And so the Solansky case, which distinguished the cases of Breck Hall and Laco, also found that the degree to which the officer complied with the city's pursuit policy, which in Solansky was very similar to the North Chicago police pursuit policy, could be used as some evidence with respect to whether the officer engaged in willful and wanton conduct. But isn't the pursuit policy related to whether or not, pardon me, the policy is based not on whether the police officer will necessarily collide with someone, but the person that he's chasing may do so, or may do things that are more lethal than what the police officer would do were he to be driving at the same high speed but not chasing anybody, whereas in this particular factual situation, Mr. Perrin wasn't in hot pursuit of anybody. That is correct, Your Honor. But the fact that he claims to have been assisting, in this instance, the North Chicago police policy specifically said to weigh the risks and benefits, and so I'm suggesting, and also to terminate if a superior requires it. In this case, the superior required that the chase be terminated before the vehicle taken without permission ever reached Abel Pawn Shop, plus assuming for the sake of argument that Perrin's testimony is true, that he was assisting at the time of the accident. I don't think that there was anything sufficiently urgent, and he should avoid the risks and benefits of driving through an intersection without looking where he was going. What about this Wade v. City of Chicago case which says this? Violation of self-imposed rules or internal guidelines does not normally impose a legal duty, let alone constitute evidence of negligence or beyond that willful and wanton conduct. That's right out of this Wade v. City of Chicago. That is correct, Your Honor. Doesn't that contradict your position? Well, the law has evolved since Wade. In 2006, the court used a 9-year-old case, Morton, and quoted Morton that the violation of the internal guidelines doesn't impose a legal duty. But the later cases of Hudson, Wade is the 2006 case, the later cases of Hudson, which was decided in 2007, and Rothwell, which was decided in 2011, clarified the position by holding that the violation of a Chicago Police Department general order does not in and of itself or per se without more constitute evidence of willful and wanton conduct, but it can be used at the trial as evidence of willful and wanton conduct as long as there is other evidence in the trial. The problem with the Wade decision is that there was no evidence that the driver was driving recklessly, that the police officer was driving recklessly. And so while it's true you cannot use a violation of the rules as the only evidence of willful and wanton conduct as they tried to do in the Wade decision, it can be used in conjunction. So that's how you're reading that? That is how I'm reading it. While I think that it's clear that we have at the very least met the requirements for the granting of a new trial, I think there are valid reasons to ask the court to reinstate the jury's verdict. Now, in the event the court chooses to uphold the summary judgment order, then the only issue according to that order was whether Perrin was responding to an emergency at the time of the accident. But there was not one scintilla of evidence produced during the trial that any emergency was involved whatsoever because the officer who was not in pursuit but following the vehicle taken without permission never used his lights or sirens. He claimed to never have been in pursuit, and there was simply no evidence that the vehicle taken without permission was eluding or fleeing Officer Gray before Perrin. Let me ask you, the officer who was conducting the initial investigation may have testified to that, assuming that's true. What about the officer involved in this case, the jury, Perrin? Is it what's in his mind as to whether or not he reasonably believed there was an emergency, or does it turn on some more objective things? Who determines if it's an emergency? Well, I would suggest it turns on more objective things, but the real problem in this case is that Perrin's accident happened before he claims to have ever formed the intention to assist Officer Grayer. So the timing is such that I think Perrin's testimony was of dubious probative value. If that were true, then why did he turn on his lights and sirens? Well, that's a very good question, which I really can't answer exactly why he was in such a hurry. However, the Hudson court has said that the activation of lights and sirens is not synonymous with being in the execution and enforcement of the law. I mean, I think there's various occasions where everyone has seen officers. Well, it isn't. The reason why I raised the point was I was responding to a conclusion based upon a premise, and it seemed that in context there seemed to be something amiss. And then you cite to a case that is factually distinguishable to attempt to establish an exception to the conclusion that you raised previously. And I don't have a problem with what the other case said because what you just said about what the other case said was is turning on your lights and your siren doesn't mean that now you're executing the law. No. But for purposes of determining whether or not this individual decided he was going to speed up and do it for some reason, he could have been going to a gas station or a donut shop. Who knows? But the point is that at least there was some intent involved here in the sense that he turned his lights and siren on vis-à-vis just speeding up or just driving through an intersection. I mean, a police officer doesn't usually turn on his lights and siren just before he's going to blow a stop sign. Usually there's some other reason for doing it. I mean, I agree with Your Honor, but not being a mind reader and not being able to rely on parents' veracity, I can't answer that question. Right, but that's an objective. We've been speaking in terms of objective facts. The lights and siren being activated doesn't rely on parents' credibility at all, does it? It's an objective factor that shows his state of mind at the time. That's correct. Objective fact is just the reason why he turned them on is something that I have no idea. As Justice McClaren said, there could have been fresh donuts at Krispy Kreme, and he was on his way for those. Any other questions? No. Okay. You'll have an opportunity to make rebuttal. Thank you. Your time is up. Okay. And you'll be able to cover other issues that you didn't necessarily cover now. Thank you. Thank you. Thank you. Ms. Barish? Good afternoon, Your Honors. Counsel, I'm Audrey Barish on behalf of the defendant's appellees. I think I'll start with where we just left off because I think it's a very important point to address, and that is Officer Perrin's course of conduct leading up to this accident. And the reason that I think that's so important is because our Supreme Court has said that for purposes of execution and enforcement, it's crucial to look at the course of conduct and to determine these situations on a case-by-case basis, and that's the Fitzpatrick case. And if you look at what the jury heard in this case, they heard that Officer Perrin turned on his lights and siren, which we just established alone may not be enough, but he also found himself outside of his routine patrol area. He normally was on a patrol in North Chicago, and on this particular evening he was on duty and he found himself a couple of blocks north of North Chicago. Why is that? The jury was – the evidence showed, and this is what the jury heard, is that he found himself a couple blocks north of North Chicago because he was en route to assist a fellow officer who had radioed in for assistance. And what Officer Perrin was trained to do was not go directly to where the last location was of that fellow officer, but to form a circle or try to get to where he thought they were going next. And Officer Perrin testified as well. He didn't – he was not so familiar with this particular area. He was trying to cut through to where he thought his fellow officer, Greer, was going. He never exceeded the speed limit. The testimony, too, is before he entered the intersection where this unfortunate accident occurred, he stopped. Officer Perrin testified he stopped at the stop sign. The driver of the vehicle, Ms. Willis, claims that she saw him stopped on the side of the road. Either way, this is evidence of cautiousness, not recklessness. He clearly was in one way or another, and we assert at the stop sign, stopped before he proceeded into the intersection. Was there any question that his lights and siren were activated at the time of the accident? No, there was not. Was there any question that he received a call regarding the other officer before the accident? No, there was not, Your Honor. So this banter about him going off on some tangent of his own simply flies in the face of the evidence, right? That is our very strong opinion, yes, Your Honor. There was absolutely no evidence of what else he might have been doing, and that's why I raise this first, because his entire course of conduct was logical and consistent with a police officer going to assist a fellow officer who had radioed in for assistance. What? Apparently the tapes weren't destroyed. They were garbled in some way? Yes, Your Honor. And we would acknowledge that it is an unfortunate situation as to what occurred with respect to the tapes. What we learned is that North Chicago automatically copies tapes of dispatch if there is a situation or incident that they think might be of issue. And they did that in this case. They copied the tape. But then we came to learn that when you copy it and you're not sitting directly at the terminal where the dispatch tape plays, there are no time stamps on that copy. And unfortunately for us, because we certainly believe that had we had the time stamps, we wouldn't be standing here today. Is this the first time that North Chicago has ever had to copy a tape? I'm sure not, Your Honor. I'm sure not. Do you think they might have figured that out sometime before this unfortunate accident? I would acknowledge that. We would hope that they would. I think part of the problem here, too, is that we had disclosed a deputy chief for North Chicago who had this information and could explain exactly how the dispatch worked and the copying of the tapes worked, and then he retired. And a new deputy chief came in who testified in this case, Deputy Chief Wilson. And he explained it as best he could. He said that only when you're sitting at the terminal can you see the time stamps. But don't you have an obligation if you're going to keep it, you might keep it in the proper form? Well, I don't know technically how they would do that. Their response was let's copy it and preserve it and not maybe realizing that that's not going to preserve the time stamp. That's the part of the case we don't have a full understanding of, and there was never a lot of discovery on this issue. The issue really didn't arise until the Friday before the trial was supposed to start when Plaintiff asked for an amendment of her complaint to suddenly include the spoliation count. This had never been raised earlier. There certainly was discussion back and forth about what we had produced, about Mr. Wilson's testimony. He was deposed. But all of a sudden, the Friday before the Monday we're supposed to start trial, there's a whole new count inserted, which would have required more evidence, more discovery. We would have been prejudiced had that spoliation count been allowed, and I believe that Judge Schipper ruled very appropriately on that issue. How would you have been prejudiced? Well, we did not explore exactly. First of all, did we have a duty to preserve in its original form? No, I mean, you're prejudiced. I mean, I understand if you were to go to trial in an hour, but a motion to continue, you think that would have been denied?  Your point is you would be prejudiced because a new count had just been filed. Continue the trial? I suppose we could have continued the trial to conduct discovery on that issue. At that point in time, our position was we had prepared, we had witnesses ready to go on Monday, and we didn't think it was appropriate. When you say somebody is sitting in front of a monitor, I gather, are we talking about a sound audio tape that has some visual markings on it? That's my understanding, Your Honor. It's called a NICE system, that's all I know, and that is how it was explained to me. You actually have to be sitting at that original terminal. Now, whether they've tweaked that since this case to figure out how to copy so that the times appear? Well, when they were copying it, were they not just hitting the record button at 10 o'clock and hitting the stop button at 1045? They apparently were recording, but then they were either muting or excising or deleting portions of the audio stream that didn't relate to this transaction. No, Your Honor. We strongly dispute that there was any alteration of this tape, and that is not what the court found from my reading of and being there. That was not a finding. It was there were portions that didn't seem complete, but the other point here is that the way dispatch comes in, whoever is on duty that night types the information into the system, and our position was that sometimes it happens right away if that dispatcher is not busy. Other times there's a delay, so even those time inputs may not always be completely accurate. Well, what I was getting at is was there any attempt to remove extraneous communiques about other cases or other calls, or was it just a continuous record from one minute on the clock to another arbitrary minute on the clock and nothing in between was done to exclude anything that didn't come or come through the speaker, so to speak? The only way I can answer that, Your Honor, is that the tape was produced to plaintiff. We listened to the tape, and the only thing on that tape is the communication between dispatch and these officers involved in this particular scenario. And the actual reports, the written reports as well, what's printed out is what relates to this particular scenario. Now, does that mean that nothing else may have been going on at the exact same time? I can't answer exactly how that works, but that is the conclusion we came to here because the tape that we had only recorded this particular event. Thank you. But you don't really know that because no one was sitting there when it was recorded. Is that your position? The only person that was there was the dispatcher and the officers who were communicating with the dispatcher. I think her question was who was there when the copy was made. You keep talking about the tape as though it's one thing. These are two separate tapes. There was the original, which would have had everything, including the timestamps, and then there was the copy that did not have the timestamps and did not apparently have everything that was originally recorded. Is that correct? I don't know if it didn't have everything that was originally recorded. That's exactly the plaintiff's point. Here's the whole tape. Someone took it upon themselves to create something less than the whole tape and say, here's the whole conversation. And the child court didn't buy that. The child court said, no, this has been altered, changed in some format, so it's not coming in. And so how did that prejudice the plaintiff? Because she didn't get the whole tape. The reliability and integrity of the tape was a doubt. Look, that's one issue, but we don't know what else was on the tape. So to say that I can't articulate how I was prejudiced because I don't know what I'm missing, but I and the trial court agree there's something missing. Okay. And so had we conducted discovery on this issue, we could have delved further into exactly what happened, what didn't happen that should have happened, and that didn't arise until the eve before trial. Did you ever intend to use the tape? We produced the tape. I don't recall. I know that when it was barred, it became a nonissue because we had the reports, the written reports that identified the sequence of events, which was what was so important to us. And let me just raise that if I can for a minute, because the actual written reports clearly show that all of this started at 7-23 and that Mr. Perrin's accident occurred on or about 7-28. So there was a four-minute gap there. And it's entirely consistent with the testimony and the evidence in this case that the call came in for assistance from Officer Greer. Officer Perrin, just like everybody else on his shift, was going to go to help Officer Greer, and bam, four minutes later, with his lights and siren and within the speed limit, intending to go assist Officer Greer, gets in this accident. And that's really, those two times, in our opinion, the sequence of events is the most important thing here. From your perspective, what gives you the authority to tell Plante what is or isn't relevant to her case? Well, the jury heard all of this. What if it was the issue of willful wanton was resolved outside of the jury? It was, Your Honor. It was on summary judgment. But what was before the jury was execution and enforcement. What was Officer Perrin doing? So negligence was still before the jury. They found that he was negligent, but they also found that he was en route to assist a fellow officer, and he was in execution and enforcement of the law. And that, whether or not something, the exact times that something happened in this case, I don't think it would have changed the outcome because the sequence was clear. And respectfully, isn't that for us to decide whether it would have been prejudicial? Of course, Your Honor. Okay. Sorry. I took all your time, so if you wish to, not to speak for the presiding, but if you wish to make a final point. What's the difference between the two instructions? A distinction without a difference? That's what we assert, Your Honor. And if anything, more clarification and consistency between the answers to those two. So first the jury comes back and does answer yes to, was Officer Perrin in execution and enforcement? Answer yes. When we realized it was the instruction, not the instruction we had intended to give the jury, we sent them back. Everybody conferred, and that was the decision. Let them go back and answer that question. And consistent with their answer on execution and enforcement, they said yes, Officer Perrin was en route to assist Officer Greer at the time of the accident. Had they answered differently, Your Honor, we would have had a problem. Well, one seems to be a mixed question of law and fact. The former and the latter seems to be a simple fact. Is that correct? Is that your position or not? Well, I think that there are a lot of similarities between the questions. One could argue that execution and enforcement would be a legal term, but the jury was advised what the meaning of execution and enforcement was. I have no further questions. Thank you. Thank you. Thank you. Ms. Villes? I'd like to get to the heart of the matter here. And as is often said, the devil is in the details. So I'd like to look at the detailed facts. Greer radioed for assistance at 723. Perrin testified he heard the call at 723, but when he heard it, he decided at that point that he was not going to go and assist Officer Greer because there were already two or three officers on their way to assist him at the time. So he testified he wasn't on his way to assist Officer Greer, but at that time he turned on his lights and his sirens. So Perrin testified about the CAD report at his deposition. And according to the CAD report, the first call that was radioed in was Perrin at 728, and he radioed in to say he had been involved in an accident that happened at 727. So three minutes and 13 seconds after Greer first radioed for assistance is the precise moment when the accident happened. But what undermines Officer Perrin's testimony the most is that, first, according to the CAD report, well, let me go back a moment. Perrin testified that he never formed the intention to assist Officer Greer until the vehicle taken without permission reached Abel Pawn Shop in Waukegan. According to the CAD report, the vehicle taken without permission reached Abel Pawn Shop at 813 that evening, 45 minutes after our unfortunate accident. Well, it's not disputed the call came in at 723? It's not disputed. You're not disputing that, okay. And the accident happened when? The accident happened at 727, but Perrin's own testimony was that he wasn't on his way to assist Officer Greer. Was there any dispute his lights and sirens were on at the time of the accident? There's no dispute his lights and sirens were on at the time of the accident, but they were also on at a time before he claims that he was on his way to assist Officer Greer. So it would appear that Officer Perrin just likes to turn on his lights and sirens even though he's not intending to assist another officer. But does that make any sense to you? Does it make sense to me? No. No, but this is what Officer Perrin consistently testified to at his deposition and at the trial. So your position is his lights and sirens are on, but he's not going anywhere. That's what he said because he said the moment he heard Officer Greer radio in for assistance, he turned on his lights and sirens, but he wasn't intending to assist Officer Greer. The next thing he says is there were other officers going, so I decided not to. Yes, he said there were two or three other officers. And the CAD report, which shows the calls that were made, indicates that there were two or three other officers on their way to assist Greer. So it is logical that Perrin decided that he wasn't going to assist him when he first heard the call at 723. Was he heading in a general direction at the time of the accident of where Greer was? No, and that's the other thing. At 727, the CAD report indicates that Greer and Martin were both located in North Chicago. They had not yet entered Waukegan because Officer, the CAD report, let me say, during the trial, Officer Greer didn't know at the time that anything happened. And so the only evidence we have regarding times is from the CAD report. And the CAD report indicates that at 727, Officer Greer was still in North Chicago, and he was at 14th Street, and he was following the vehicle taken without permission around various streets. And Officer Martin most importantly testified that that night, between 723 and 730, he was located in North Chicago. So clearly no one had entered Waukegan at the time of Perrin's accident. So Perrin was up in Waukegan while all the other officers were still back in North Chicago. Could you explain how a spoliation count would have succeeded, considering the fact that the jury verdict on negligence counts was in your favor? Because a spoliation cause of action has to establish that but for the destruction of the evidence, you would not have obtained a judgment, or possibly you would not have obtained the judgment because the judgment you received was less than what you would have gotten because of the spoliation. There has to be some nexus between that and the verdict. I mean, you can say, okay, they didn't consider it, but you still came back with a verdict in your favor. I understand that. I think the problem was that the jurors misunderstood what was involved in terms of execution and enforcement of the law. And had they had the tape in there, they would have heard that the call was terminated before the car reached Abel Pawn Shop. And they might have found, had they heard the tape, they might have found that it wasn't an execution and enforcement of the law because they could have heard for themselves that he called in his accident before any of these other things took place. The first event was his accident. And so I think it might have changed their answers to the special interrogatories. Is it safe to say that the action occurred before the call withdrawing the chase was entered? Yes, it did. It did. I have a question. Why file the spoliation on the EVA trial? Because I had been misled to believe all the way up until April 29, 2014, that had we had the original tapes, that we would not have been able to tell what the times were. And it wasn't until the deposition of Richard Wilson that I learned that had we had the original tapes, that we could have told what time everything happened. And so... I don't recall the dates. How far in advance of trial was that deposition? That was... Something like five months? Yes, but the deposition, during that time, the defendant's summary judgment motion was pending. And I didn't see any point in filing an expoliation of evidence count if I was going to be dismissed on summary judgment. And the summary judgment order was entered on June 24th, only 15 days ahead of the trial. And so, that is why I brought the expoliation count at the time that I did. Thank you. Court's adjourned. I hope to render decisions at a reasonably speedy time.